## STATE v. LINDLEY.

1. Prosecuting witness had purchased an interest in defendant's store, and had deposited with him money to be applied on the price when an invoice was taken. On the morning of the second day thereafter defendant called a neighboring blacksmith into his store, and, pointing to some tools on the floor before his safe, asked if they did not belong to him, and then stated that the safe had been blown open in the night, and money belonging to himself and prosecuting witness taken. On the evening before hammering was heard in the store at 7:30, and defendant was seen coming from the blacksmith shop at 9 o'clock, and from a drug store at 11 o'clock. He stated to a customer the day before that he would have to go out to get change, as the combination on his safe was out of order, and during that day he appeared nervous. The safe appeared to have been shattered by an explosive, and showed marks of tools. *Held*, that the evidence did not show beyond a reasonable doubt that defendant was guilty of breaking open his own safe and stealing the money.

2. Where defendant sold an interest in his store to prosecuting witness, and received a portion of the money in good faith, which was not to be applied on the purchase money until an invoice was taken, the fact that he thereafter contrived to defraud prosecutor of such money by pretending that it it had been stolen from him, did not render him liable to prosecution for larceny thereof.

·3. Where a defendant received money from a prospective purchaser of his personal property, and thereafter formed a design to defraud the purchaser of the money by pretending that it had been stolen, and there was no evidence to show that defendant entertained such design when he received the money, it was error to instruct that if he had received the money with such fraudulent intent the jury should find him guilty of larceny.

(Opinion filed June 20, 1900.)

Error to circuit court, Marshall county. Hon. FRANK B. SMITH, Judge.

G. B. Lindley was convicted of larceny of money, and, his motion for a new trial being overruled, he brings error. Reversed.

The facts are stated in the opinion.

*Sears & McCoy,* and *L. W. Crofoot,* for plaintiff in error.

An instruction not supported by substantial evidence is reversible error. Rosenkrantz v. Wolf, 115 Ill. 331; 2 Enc. of Pl. and Pr. 576.

If possession of the property is obtained by lawful means there can be no larceny even though it is afterwards appropriated to the use of the taker. 12 Ency. of Law, 770; Beatty v. State, 61 Miss. 18; Stockley v. State, 6 S. W. 538; Watkins v. State, 60 Miss. 323, Snapp v. Corn, 82 Ky. 173.

Inducing an owner of property, by a fraudulent trick or device, and with felonious intent, to part with his possession temporarily, and then appropriating the property to one's own

use, against the consent of the owner, is larceny. People v. Roe, 6 Pac. 1; 12 Ency. Law, 770; Miller v. Comm., 39 Am. Rep. 194; Loomis v. People, 67 N. Y. 322.

If the owner consents to the transfer of title, however that transfer is brought about, there is no larceny. Kelly v. People, 6 Hun. N. Y. 509; Johnson v. People, 113 Ill. 99; Thorne v. Tuck, 94 N. Y. 90; Link v. People, 77 N. Y. 114; Smith v. People, 53 N. Y. 111; Kellogg v. State, 26 Ohio St. 15; Perkins v. State, 65 Md. 317.

*John L. Pyle*, Attorney General, *Byron Abbott*, State's Attorney, and *A. Sherin*, for the defendant in error.

The appellate court will not set aside the verdict of the jury except where there is clearly an absence of evidence against the defendant or a decided preponderence of evidence in his favor. People v. Ah Loy, 10 Cal. 301; People v. Brown, 27 *Id.* 501; People v. Magallones, 15 Cal. 428; People v. Vance, 21 *Id.* 400; People v. Hamilton, 46 Cal. 540; 1 Greenl. Ev. 49; People v. Jones, 31 Cal. 566; Williams v. State, 21 N. W. 56; Territory v. Stone, 2 Dak. 155; People v. Simpson, 50 Cal. 306; People v. Ben Gill, 45 Cal. 285; McCann v. Meehan, 11 N. W. 52.

The granting of a new trial for any reason is discretionary and on appeal that discretion will not be revised except in cases of gross abuse. Bonville v. State, 11 N. W. 427; Slaman v. Burnham, 16 N. W. 38; Hodges v. Bierlein, 4 S. D. 258.

Where the evidence is conflicting, a verdict of conviction will not be set aside on the ground that it is contrary to the evidence. People v. McCurdy, 68 Cal. 576; people v. Wilson, 66 Cal. 370; United States v. Camp, 10 Pac. 226; People v. Noyes, 6 Pac. 691.

CORSON, J.   Upon an information duly filed the plaintiff in error was tried and convicted of the crime of grand larceny, and sentenced to a term of two years and six months in the state penitentiary.   A motion for a new trial was made and denied,   The case is now before us for review on a writ of error issued to the circuit court of Marshall county.   The plaintiff in error, whom we shall hereafter designate as the "accused," contends (1) that the court erred in not granting a new trial on the ground that the verdict of the jury was against the law and the evidence; (2) for the reason that the court erred in instructing the jury that if the accused fraudulently obtained possession of the money of the complaining witness he might be found guilty of feloniously stealing it, as there was no evidence upon which such an instruction could properly be based.

The first question presented is in the nature of a demurrer to the evidence.   The contention of the accused is, in effect, that, conceding the evidence on the part of the prosecution to be absolutely true, and drawing all the inferences therefrom that a jury might properly draw it was not sufficient to justify or warrant the verdict of the jury.   The evidence of the alleged larceny was substatially, if not entirely, circumstantial.   It is stated as the general rule in Wills, Circ. Ev. p. 149, that, "to justify the inference of legal guilt from circumstantial evidence, the existence of the inculpatory facts must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt."   Substantially the same rule is laid down in Starkie, Ev. p. 838.   The same rule is referred to by Wharton in his work on Criminal Evidence (9th Ed., § 10).

It is also cited with approval in Greenl.. Ev. (14th Ed.), in a note to section 13a. In the text Mr. Greenleaf says: ·'In civil cases, it is sufficient if the evidence, on the whole, agrees with and supports the hypothesis which it is adduced to prove, but in criminal cases it must exclude every other hypothesis but that of the guilt of the party." In Com. v. Webster, 5 Cush. 296, the supreme court of Massachusetts, speaking by SHAW, C. J., said: " Another rule is that the circumstances, taken together, should be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion, and producing, in effect, a reasonable and moral certainty, that the accused, and no one else, committed the offense charged. It is not sufficient that they create a probability, though a strong one; and if, therefore, assuming all the facts to be true which the evidence tends to establish, they may yet be accounted for upon any hypothesis which does not include the guilt of the accused, the proof fails. It is essential, therefore, that the circumstances taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis."

Were the inculpatory facts proven on the part of the prosecution incapable of explanation upon any other hypothesis than that of the guilt of the accused? In order to fully understand the questions presented, a brief review of the evidence given on the part of the state will be necessary. The accused was a resident of Langford, Marshall county, where he had resided for about 13 years, and where for five years or more he had been engaged in the mercantile business, doing such business in his own name.

The transaction in regard to the money alleged to have been stolen is thus detailed by Zachariah Lyons, the prosecut-

ing witness, who testified on the part of the state: "I am the prosecuting witness. In July, 1898, I had conversations with the defendant. He wanted to borrow $100,—said he wanted to pay some debts. I told him I had $700 at home, one-half of which belonged to my mother. We talked along, and he wanted me to go into partnership with him. I told him I would see my mother, and let him know. I saw her and she said it was all right. We went to see defendant, and he said it was all right, and we would form a partnership. He claimed his goods were worth $1,600. He wanted us to put in $700. Before we went away he told me to bring the money down, that he wanted to use $100. I brought it down to him about July 19th. The conversation about the partnership was about a week prior to that time. I brought the money, and counted it out to him on the counter of his store. There was $700. This money was paid to be used in the partnership. It was paid for my share of the stock after the goods were invoiced. After the goods were invoiced I was to have $700 interest in it. The money was left there to pay for the goods after the invoice was taken. The day I paid him the money he said we would hurry around and invoice as soon as we could. I told him we could not invoice that day or the next, as I had to go to Claremont and move to town. When I paid him the money he said, 'We will invoice the goods;' and I said I could not until the 21st; and he said, 'All right, we can invoice at any time.' I do not remember if I testified on the former trial that when I paid Lindley the money he said, 'We will commence invoicing immediately;' and to which I said, 'I cannot now, as I want to go to Claremont and move to town.' His boy came and told me on the morning of July 21st that the safe was broken open,

and all the money taken. I went to town that morning, and saw Lindley in his store. He showed me how he thought the safe was broken open and the money taken,—the $700 and some of his own money. He claimed it looked as if it had been blown open, * * * Defendant has not returned the $700 or any part of it. I went to see him about invoicing the goods. He would invoice the goods all right, but wanted me to put in more money. We never took an invoice. He would not take me in partneship unless I put in more money, and would not give me credit for the $700. The next day after the safe was broken open he said we would go on with the business just the same as if we had not lost it. Then, in a day or two, he said we would go on if I put in more money. I told him I had put the money there once, and would not put in any more." The witness further testified: "He urged me to bring in the money before the invoice was taken, and said we would hurry around and take the invoice of the goods as soon as we could. I told him when I paid him the money I could not take the invoice that day or the next. He said we would invoice the goods. I think on the 21st of July he said we would invoice the goods. I paid him over the $700 at his request, and did not give him any instructions as to where to keep it. He said he wanted to use some of it before we took the invoice. The money was to be kept by him until we took the invoice, and then to be applied in paying for a share of the goods. I did not give him the title to the money, but only the possession."

J. Case, a blacksmith, was then called, and testified that he was in the store of the accused on the morning of the 21st, when it is claimed the safe was discovered to be broken open; that he saw the accused and his wife standing in front of their

store, and the accused motioned to him; that he went into the store, and the accused asked him if the tools there were his tools; that he looked over the tools scattered in the refuse on the floor from the safe, and found that a part of them belonged to him; that he asked the accused how much money had been taken, and he answered about $1,00), —$700 brought there by Lyons and about $275 of his own; "he said he found the safe in that condition,—the door open, with the concrete filling and refuse lying around on the floor." The witness testified he thought "the safe was blowed and opened out," and he described at some length the appearance of the door. He gave it as his opinion that the parties breaking into the safe had tried to cut the dial bolt off with a cold-chisel, and by striking the end with a sledge hammer broke it off. He found indications that explosives had been used in the hole where the bolt goes through, and burnt places on the front and back of the outside door plate, as if a fuse had been burned there; "looked as though they had touched off a charge;" showed powder burns, and a black streak an inch and a half long; he picked up a piece of partly burned fuse. Witness testified that his shop was in the block south of the store of the accused, and across the street; that on said morning he found his window raised, and the main door unlocked; that the tools which he found in the store of the accused were left on a bench in the shop the night before; that some boys had a lodge in the office of his shop, and they had two or three keys, and he thought the accused had one. He further testified that when he was called into the store by the accused the accused was not excited, and said to him, "Are those your tools?" and that it was not until then that he noticed the broken safe and the refuse on the floor; that he

did not find any of his shop doors open that morning, but the main door, which fastened on the inside and could not be opened from the outside, was unfastened; that some one must have entered through the office door, locked it again, and come out through the main door; accused had a key, he thought, to the office door; in the store that morning the accused seemed to be figuring what sum he had lost, and made various statements as to the amount.

One John Fetterly testified that he was going east along the street looking for a horse when he saw the accused coming out of Case's blacksmith shop, coming from the double door; that he recognized and spoke to him, but accused did not answer; it was about 9 o'clock in the evening before the safe was broken open, and that accused was going towards the store.

Adelbert Case also testified that he met the accused about 9 o'clok that evening on the corner northeast of his father's shop; that he spoke to him and got no reply; that he saw him afterwards, about 11 o'clock, coming out of Farrar's drug store.

Don Rundbert testified that he was with Adelbert Case that evening, and corroborated his statements, and testified, "I saw him plainly, and knew who he was."

N. E. Thompkins testified that he was in the store of the accused on the night of July 20th, the evening before the safe was broken open, about dark; that he noticed something peculiar and strange in the actions of the accused that evening; that he seemed very uneasy, and "did not seem to be resting about something,"—so much so that it attracted his attention; does not believe accused is usually a nervous and excitable man.

Witness was making out a mortgage, and thought at that time that it was that which was making the accused nervous.

The son of the accused testified that he was 16 years old, and slept in an addition to the back room of the store the night the safe was broken open; that no one slept with him; that there was a door from the store room to the back room, but no door hung between the back room and the addition where he slept; that he did not hear any noise that night,—no pounding, no explosion; that he slept soundly; that when he closed the store at night he usually took the cash to his father, but since he slept in the store he never took care of the cash; that his father as a rule took the cash; that he and his father were the only ones who knew the combination to the safe; that they were doing a fair business at the store at that time, taking in from $15 to $20 a day; that when his father took care of the cash he usually took it to the house.

Charles Fetterly testified on the part of the state that he saw the accused at the store the day prior to the blowing open of the safe, at about 5:30 p. m.; went there to buy a jacket, and saw no one there but the accused, who was in the back end of the store; bought a blue wamus for a dollar, and gave a $10 bill in payment; accused went out to get change, saying he could get it quicker than from the safe, as there was something wrong with the combination; accused was somewhere near the safe when witness came in; that accused had the witness arrested next day, but that he knew nothing about the breaking, and never had an examination, but "was turned loose again" at the request of the accused; that he then made up his mind that the accused was the man who got the money; that these facts were what impressed the whole transaction upon

his mind. Witness further testified that he passed the store about 7 o'clock that evening, and heard hammering in the store. "I thought he was pounding a box. · I heard three distinct strokes. It sounded like he struck something solid, like iron. There was a dim light in the back of the store." On cross-examination he testified it was about 7:30 when he passed the store. "When I went by the store it sounded like striking a box. I heard him strke the box three times."

It will be observed that the evidence showing, or tending to show, that the accused blew or broke open his own safe, or .that he was seen in or about his store during the night, or that he was seen carrying any tools from the blacksmith shop of either Case or Ously during the night, was very slight, if in fact it can be said there was any evidence upon the subject. It will be observed, also, that there was no evidence showing; or tending to show, that any part of this $700 alleged to have been stolen was at any time found in his possession, or that he paid it out in any manner. The only inculpating facts connecting the occused with the breaking open of the safe which merit any consideration were that he was seen to come from the blacksmith shop of Case about 9 o'clock in the evening, and that he was apparrently the first at the store in the morning, when he called the attention of Case to the fact that the safe had been opened; and, possibly the further fact that he was seen to come out of the drug store at about 11 o'clock that night. Was the existence of these facts absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt? There was certainly nothing in the fact that he was seen coming out of the drug store at 11 o'clock inconsistent

with his innocence, and we may presume that he was at the drug store for a proper purpose, as the druggist himself was not called as a witness on the part of the state. Neither is the fact that the accused was at his own store in the morning with his wife necessarily inconsistent with his innocence. As he was the owner of the store, it was perfectly proper for him to be there. Neither can the fact that he was seen to come out of Case's blacksmith shop at about 9 on a July evening be regarded as absolutely inconsistent with his innocence. Had he been seen coming from that shop at a late hour in the night or early in the morning, with something in his possession having the appearance of blacksmith's tools, such an act might be regarded as inconsistent with his innocence. His remark when about to change a $10 bill that there was something wrong with the combination of the safe, and the evidence that about half past seven in the evening he was heard hammering what sounded like boxes, and that he appeared strange and nervous in the evening while the witness was drawing up a mortgage in his store, cannot be seriously claimed as inconsistent with his innocence.

The theory of the prosecution is that the accused fraudulently induced Lyons, the complaining witness, to leave with him the $700 with the intention of converting it to his own use, or in other words, feloniously stealing it, and that, in order to make it appear that his store had been burglarized, he broke open his own safe. The difficulty with this theory is that it is not sustained by sufficient evidence. If there had been evidence sufficient to warrant the jury in finding that the accused had broken open his safe, then it might be reasonably urged that the jury might find that he fraudulently intended to get

possession of the money of Lyons for the purpose of converting it to his own use; but a jury cannot be justified in assuming that he broke open his own safe, and, from that fact assumed, conclude that he obtained the money from Lyons with the intention at the time he so obtained it of converting it to his own use.

It is contended on the part of the appellant that if the accused acquired possession of the money rightfully he could not be guilty of stealing it, though he afterwards converted it to his own use, and that in such case it would be embezzlement, and not larceny. This position is undoubtedly correct if the accused did not acquire the possession with the fraudulent intent of converting the money to his own use at the time he obtained possession of it. If, however, as contended on the part of the prosecution, his arrangement with Lyons for a partnership was a mere pretense and sham, and made for the purpose of securing possession of the money, then, if he converted it to his own use, it would constitute larceny. But, as before stated, unless it is assumed that the accused was guilty of destroying his own safe for the purpose of making it appear that he had been robbed of the money so left with him by Lyons, there seems to be practically no evidence to establish the fact that he did obtain the possession of the money from Lyons with the fraudulent intent of depriving him of the same.

The contention on the part of the plaintiff in error that the instruction of the court to the jury upon the subject of what would constitute fraud in obtaining possession of the money of Lyons was unsupported by the evidence is, in our view of the case, correct. If there was not evidence to warrant the jury in finding that the accused broke open his own safe, then there

was no evidence upon which the court could properly base the following instruction to the jury: "If you believe from all the evidence * * * the property mentioned in the information, or any part of it, was obtained from Zachariah Lyons by the defendant, you will then find whether it was obtained or procured fraudulently. Fraud in larceny may consist in simply obtaining or receiving possession of personal property with the purpose and intent of ultimately stealing it, or in making any promise, agreement, or arrangement with the owner or person in possession or control of the property, with the determination and intent not to perform such agreement, promise, or arrangement, or it may consist of any shift, device, or trick by which the owner or person in possession or control of the property was influenced or induced to part with the possession or control of the property when he would not have parted with it had he known the truth and intentions of the party obtaining the property. If, however, he does not procure or obtain money in the first instance fraudulently, as I have defined it to you, but comes into possession of it honestly, without any intent of unlawfully appropriating it, he cannot be convicted of larceny, although he afterwards form the design and intent of unlawfully taking and appropriating the money, and did take and appropriate it." Assuming that there was evidence which would warrant the jury in finding the accused guilty of actually appropriating the money to his own use, the instruction was clearly correct. But we are of the opinion, for the reasons before stated, that there was not sufficient evidence upon which to base the instruction, and a court is not justified in instructing a jury upon a question unless there is evidence upon which the instruction can be prop-

erly based.    It is not sufficient that the counsel have a theory which they desire to bring before the jury, but, that theory must be supported by the evidence.

We do not wish to be understood in this opinion as intimating that a conviction cannot be had upon circumstantial evidence. Such evidence is often the most satisfactory and conclusive of the guilt of the accused.    See authorities *supra.*    But, as before stated, the facts relied upon to secure conviction must be incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt.    As stated by Mr. Greenleaf, "The evidence must exclude every other hypothesis but that of the guilt of the party."    Greenl. Ev., *supra.*    The facts established in this case fall far short of coming within the rule laid down in the authorities cited.    Neither a court nor jury can say that the facts proven are absolutely incompatible with the innocence of the accused, or incapable of explanation upon any other reasonable hypothesis than that of his guilt.    While the facts are consistent with the guilt of the accused, they are not absolutely inconsistent with his innocence, and in such a case the accused cannot be legally convicted.    The judgment of the circuit court is reversed, and a new trial ordered.